**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | | |
|---|---|---|
| Lawrence Butler, Lakeisha Darwish, and Jimi Che Sutton, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 0:17-cv-02201-JMC |
| | ) ) | **ORDER & OPINION** |
| v. | ) ) ) | |
| Fluor Corporation and Fluor Enterprises, Inc., | ) ) ) | |
| Defendants. | ) ) ) | |
| Harry Pennington, III and Timothy Lorentz, individually and on behalf of all those similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 0:17-cv-02094-JMC |
| v. | ) ) ) | |
| Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc., SCANA Corporation, and South Carolina Electric & Gas Company, | ) ) ) ) ) | |
| Defendants. | ) ) | |

Pending before the court are Motions for Summary Judgment by Defendant Fluor (ECF Nos. 189 (*Butler*); 233 (*Pennington*)), Defendant SCANA (ECF Nos. 192 (*Butler*); 236 (*Pennington*)), and the above-captioned Plaintiffs, both individually and on behalf of all those

similarly situated (ECF Nos. 191 (*Butler*); 235 (*Pennington*)).[1] The central issue of these Motions is which Defendants, if any, should have provided notice under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* ("WARN"), after SCANA abruptly terminated the construction of two multi-billion dollar nuclear reactors that led to the layoff of thousands of workers with no advanced warning.[2]

The Motions have been fully briefed and are ripe for consideration. Specifically, Plaintiffs have filed Responses (ECF Nos. 203, 206) and Replies (ECF Nos. 210, 212) to Defendants' Motions for Summary Judgment. Defendants have likewise responded in opposition to Plaintiffs' Motion for Summary Judgment. (*See* ECF Nos. 200, 204, 208, 215). SCANA also filed a short Brief in Response to Fluor's Motion for Summary Judgment. (ECF No. 202.) Moreover, non-party Associated Builders and Contractors, Inc. filed an Amicus Brief (ECF No. 199), to which Plaintiffs filed a Brief in Response (ECF No. 214).[3] Plaintiffs also filed a supplement asking the court to take judicial notice of the Information and Plea Agreement of Kevin B. Marsh, SCANA's former CEO, who intends to plead guilty in a criminal matter related to the underlying facts of this case. (ECF No. 219.) Defendants filed Briefs in Response (ECF Nos. 221, 227), to which Plaintiffs replied (ECF No. 232).

---

[1] The term "Fluor" as used throughout this Order refers to Fluor Corporation, Fluor Enterprises, Inc., and Fluor Daniel Maintenance Services, Inc. The term "SCANA" refers to both SCANA Corporation and South Carolina Electric & Gas Company. Moreover, ECF citations in this Order refer to entries in *Butler v. Fluor Corp.*, C/A No. 0:17-cv-2201-JMC unless otherwise indicated. Citations to transcripts refer to the transcript's original pagination, rather than the pagination generated by ECF.

[2] The court *sua sponte* consolidated *Butler v. Fluor Corp.*, C/A No. 0:17-cv-2201-JMC, and *Pennington v. Fluor Corp.*, C/A No. 0:17-cv-02094-JMC, and each case covers the same class of eligible individuals. (ECF Nos. 43, 79 (*Pennington*).) The court allowed counsel from both cases to remain in the case, and the court did not segregate any of Plaintiffs to any class of lawyers.

[3] Relatedly, given the voluminous record in the case, the parties rely upon various exhibits, briefs, and other materials found in the following entries: ECF Nos. 189-193, 199-215, 219, 221.

For the reasons below, the court **GRANTS** Fluor's Motion for Summary Judgment (ECF Nos. 189 (*Butler*); 233 (*Pennington*)), **GRANTS** SCANA's Motion for Summary Judgment (ECF Nos. 192 (*Butler*); 236 (*Pennington*)), **DENIES** Plaintiffs' Motion for Summary Judgment (ECF Nos. 191 (*Butler*); 235 (*Pennington*)), **DENIES** Plaintiffs' Request to Supplement (ECF Nos. 219 (*Butler*); 263 (*Pennington*)), and **DISMISSES** the case with prejudice.

## I. BACKGROUND[4]

In 2008, SCANA contracted with Westinghouse Electric Company LLC ("WEC") to build two nuclear reactors at the V.C. Summer Nuclear Station in Jenkinsville, South Carolina ("Project"). (ECF No. 114 at 6 ¶ 31 (*Pennington*).) The Project, along with one other unrelated nuclear reactor site in Georgia, "represent[ed] the first new generation of nuclear power plant construction in the United States in 30 years." (*Id.* ¶ 32 (*Pennington*).) SCANA owned the Project site and facilities. (*Id.* at 5 ¶ 25 (*Pennington*).)

The contract between SCANA and WEC took the form of an Engineering, Procurement, and Construction Agreement ("EPC Agreement"). (ECF Nos. 114 at 6 ¶ 31 (*Pennington*); 193 at 3.) "Under the EPC Agreement, WEC was generally responsible for the design, manufacture, and procurement of the nuclear reactor, steam turbines, and generators[.]" (ECF Nos. 41 at 5 ¶ 34 (*Pennington*); 114 at 6 ¶ 34 (*Pennington*).) In January of 2016, WEC hired Fluor as a subcontractor to "employ craft employees on the [P]roject and t[a]ke responsibility for management of on-site construction while [WEC] remained responsible for designing, engineering, construction, and project management." (ECF No. 114 at 7 ¶ 37 (*Pennington*).) Later in 2016, WEC asked Fluor to complete a cost analysis to determine the cost of completing the Project based on WEC's current

---

[4] The following facts are undisputed for the purposes of the pending Motions for Summary Judgment unless otherwise indicated.

schedule. (ECF Nos. 68 at 4 ¶ 41(*Pennington*); 114 at 7 ¶ 41 (*Pennington*).) This Estimate to Completion ("ETC") cost analysis allegedly found the Project would cost several billion dollars more than previously anticipated, for which WEC would be liable. (ECF No. 41 at 8 ¶ 42 (*Pennington*).)

Subsequently, the financial health of WEC deteriorated to the point that, on March 29, 2017, WEC filed for bankruptcy protection under Chapter 11 of Title 11 of the United States Bankruptcy Code in the Southern District of New York. (ECF Nos. 41 at 8 ¶ 45 (*Pennington*); 68 at 5 ¶ 45 (*Pennington*); 114 at 8 ¶ 45 (*Pennington*).) Shortly thereafter, SCANA and WEC entered into an Interim Assessment Agreement ("IAA"), which stated the parties remained obligated to continue performing work under the EPC Agreement and that going forward, SCANA would pay Fluor, among other things. (ECF Nos. 114 at 8 ¶ 46 (*Pennington*); 192-5.) WEC continued as the on-site contractor for the Project. (*See* ECF No. 114 at 9 ¶ 53 (*Pennington*).) The United States Bankruptcy Court approved the IAA. (*See* ECF No. 192-5.) Plaintiffs contend SCANA began taking a more active role at the Project after WEC's bankruptcy such that it essentially became a single employer with its contractors under the WARN Act.[5] (ECF No. 193 at 3-4.)

On July 31, 2017, SCANA stopped all construction at the Project. (ECF Nos. 41 at 17 ¶ 95 (*Pennington*); 68 at 8 ¶ 95 (*Pennington*); 114 at 15 ¶ 95 (*Pennington*).) As a result of this decision, it appears that approximately 5,000 workers were impacted who had been working and/or receiving assignments at the Project.[6] (*See id.*) It is undisputed that SCANA alone ordered the Project's closure and gave no advanced warning to Fluor. (ECF No. 205 at 35.)

---

[5] Given the voluminous record in this case, the court thoroughly outlines and examines the facts below for this fact-intensive inquiry.

[6] After the Project's closure, Fluor allegedly continued to pay (or returned to work within six months) 1,200 employees, while WEC did the same for 200 of its direct employees. (ECF Nos. 192-1 at 9; 192-22.) The remaining 3,600 workers were purportedly laid off.

As a result of the foregoing, Plaintiffs filed a putative class action Complaint in this court against Defendants in August 2017, alleging a violation of the WARN Act. (ECF Nos. 1, 41 (*Pennington*).)   Plaintiffs contend SCANA, WEC, and Fluor, which comprise a total of six different entities, essentially all acted as a single employer under the WARN Act and knowingly failed to give their employees at least 60 days' prior notice of termination of their employment as required by the WARN Act. (ECF No. 41 (*Pennington*).) Plaintiffs further argue Fluor should not escape liability under the WARN Act because the shutdown was reasonably foreseeable. (ECF No. 1 at 7 ¶ 33.)

## II. JURISDICTION

This court has jurisdiction over Plaintiffs' cause of action under the WARN Act via 28 U.S.C. § 1331, as it arises under a law of the United States, and also via 29 U.S.C. § 2104(a)(5), which empowers district courts to hear claims alleging violations of the WARN Act.

## III. LEGAL STANDARD

### A. <u>Summary Judgment</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248-49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-

24 (4th Cir. 1990). The non-moving party may not oppose a motion for summary judgment with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 252 (1986); *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249.

"When considering motions from both parties for summary judgment, the court applies the same standard of review and so may not resolve genuine issues of material fact." *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) (citation omitted). "Instead . . . [the court] consider[s] and rule[s] upon each party's motion separately and determine[s] whether summary judgment is appropriate as to each under the Rule 56 standard." *Id.* (citation omitted).

### B. <u>The WARN Act Generally</u>

The passage of the WARN Act came about during a difficult time for America's workers. In 1987, Bureau of Labor statistics reflected that

> during the five-year period 1981-1986, over 11 million workers lost their jobs under circumstances suggesting that they would not get them back. Many of these workers had considerable job experience--5.1 million had worked a minimum of three years in their former jobs. Half of the latter group had worked six or more years.

Marisa Anne Pagnattaro, *The Perils of Control: Affiliated Liability Under the Warn Act*, 41 AM. BUS. L.J. 313, 317-19 (2004). "[T]he House of Representatives Committee on Education and Labor report acknowledged that the 'adverse effects of a plant closure or mass layoff usually are not limited to the displaced workers and their families . . . [t]he domino or ripple effect of a plant

6

closing has been well documented.'" *Id.* (citation omitted). Congress addressed this problem with the WARN Act, which one United States Senator described as exemplifying

> a very simple and understandable American value, and that is the American value of fairness, fairness to men and women who have devoted in many instances their lifetime to a particular corporation, a particular business, and a particular industry and deserve more than a pink slip at the end of a Friday afternoon to indicate to them that their lives will be disrupted . . . in ways that, of course, could have been predictable but because of the decision that was made by American business they would not receive the benefit of adequate notification.

*Id.* at 318 (citing 100 CONG. REC. S. 16671 (daily ed. July 6, 1988) (statement of Sen. Kennedy)). The WARN Act ultimately took effect in 1989 and has "been consistently recognized as a remedial statute which must be construed broadly to protect workers." *Id.* at 318-19 (citation omitted).

The United States Court of Appeals for the Fourth Circuit has likewise explained the WARN Act "provide[s] notice of sudden, significant employment loss so that workers [can] seek alternative employment and their communities c[an] prepare for the economic disruption of a mass layoff." *Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 808 (4th Cir. 2007) (citing *Bader v. N. Line Layers, Inc.*, 503 F.3d 813 (9th Cir. 2007); 20 C.F.R. § 639.1(a) (1989)).

The crux of the WARN Act states "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to its employees. 29 U.S.C. § 2102(a). "An employer who fails to provide this notice is liable to each affected employee for backpay, benefits, and attorney's fees." *Meson*, 507 F.3d at 808 (citing 29 U.S.C. § 2104(a)).

Who is an "employer" under the WARN Act? For one, the employer must order the plant closure or mass layoff. *See McKinney v. Carlton Manor Nursing & Rehab. Ctr., Inc.*, 868 F.3d 461, 463 (6th Cir. 2017) ("Only 'employers' that 'order' a plant closing face regulation by the [WARN] Act or liability under it."); *Deveraturda v. Globe Aviation Sec. Servs.*, 454 F.3d 1043,

1049 (9th Cir. 2006) ("The critical inquiry is not what entity employed the affected employees at the time of the layoff; rather, it is who ordered the layoff to occur."); *Hotel Emps. and Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 187 (3d Cir. 1999) (Alito, J., concurring) ("[The WARN Act's] language is straightforward and clear—the WARN Act applies only when an "employer" orders a plant closing—and where, as here, the statutory language is unambiguous and does not demand an absurd result, the sole function of a court is to enforce the statute according to its terms); *Flowers v. Here to Serve Rests., Inc.*, 2016 WL 8792243, at *2 (N.D. Ga. 2016); *Holliday v. MVM, Inc.*, No. CV 08-07924-DMG, 2011 WL 13186050, at *7 (C.D. Cal. Mar. 2, 2011) ("The key question under . . . Ninth Circuit precedent . . . is who ordered the plant closing. Given that the government made the decision to close the [immigration processing facility] and Defendant[, a security contractor,] merely responded to this order by laying off its employees who worked there, the Court finds as a matter of law that the WARN Act does not apply."); *but see Halkias v. General Dynamics Corp.*, 137 F.3d 333, 336-37 (5th Cir. 1998) (explaining a defense contractor's mass layoff *at its own facility*, after the U.S. Government cancelled a large contract for A-12 planes, invoked the WARN Act, but regardless the contract cancellation was an unforeseeable business circumstance (emphasis added)); *Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1062-63 (8th Cir. 1996) (similar).

Moreover, by statute, a WARN employer "means any *business enterprise* that employs" 100 or more full-time employees or part-time employees that work at least 4,000 hours per week. 29 U.S.C. § 2101(a)(1) (emphasis added). The term "business enterprise" is undefined, suggesting a WARN "employer" may in fact constitute more than one company.[7]

---

[7] SCANA complied with the WARN Act for its direct employees but did not provide any advanced notice of the Project's termination to employees of WEC and Fluor. (*See* ECF No. 114 at 14 ¶ 94-95 (*Pennington*).) SCANA "complied" with the WARN Act's notice requirement by providing 60

The WARN Act's regulations expound that "[u]nder existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent." 20 C.F.R. § 639.3(a)(ii)(2) (1989). Thus, the WARN Act's regulations contemplate an independent contractor being held liable under the WARN Act in certain circumstances.

Determining whether two affiliated companies amount to a single WARN employer has been a disorganized, complex, and sometimes contradictory area of law, as various courts have applied numerous tests to determine whether two corporations comprise a single, liable entity. *See, e.g., Pearson v. Component Tech. Corp.*, 247 F.3d 471, 483 (3d Cir. 2001) (compiling cases). Given these difficulties, the Third Circuit in *Pearson*—a seminal decision upon which all parties rely heavily—proclaimed that simply applying the five factors delineated in the WARN Act ("DOL Factors") is the best course when determining single employer liability under the WARN Act. *Id.* at 495-96. This court observes the Fourth Circuit has not provided specific guidance regarding which standard a district court should use to evaluate single employer status under the WARN Act. Nevertheless, the court agrees with the persuasive reasoning in *Pearson* and applies the DOL Factors in this case.

The DOL Factors outlined in the WARN Act's regulations examine subsidiary or independent contractor liability with its parent or contracting company by scrutinizing: "(i)

---

days of compensation to its direct employees beginning on the date of the Project's closure on July 31, 2017, which is one way to avoid liability under the WARN Act after failing to give advanced notice of a mass layoff or plant closing. *See also Long v. Dunlop Sports Grp. Americas, Inc.*, 506 F.3d 299, 303-04 (4th Cir. 2007) (explaining that if an employer closes a plant without notice, it may nonetheless avoid WARN liability by thereafter providing 60 days of compensation to its employees).

common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations" 20 C.F.R. § 639.3(a)(ii)(2). The DOL Factors in essence seek to determine whether two (or perhaps more) affiliated corporations or entities acted as a "single employer" to invoke WARN liability.[8] *Pearson*, 247 F.3d at 490-91 (noting the DOL Factors "are a non[-]exhaustive list"). "As in any balancing test, application of these factors requires a fact-specific inquiry, no one factor set out by the DOL is controlling, and all factors need not be present for liability to attach." *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 226 (2d Cir. 2013).

Yet the application of the DOL Factors does not end this case's complications. The vast majority of cases applying the DOL Factors involve parents and their subsidiaries, or as in *Pearson*, a lender-borrower relationship that functioned as a parent-subsidiary relationship. Many of these cases are examined further below. As one might expect, the parties vigorously argue these cases are distinguishable in varying contexts. Cases involving contractors are likewise not particularly congruous to the instant matter as further discussed *infra*. Moreover, the parties, the non-party Amicus Brief, and the court have not identified any case imposing single employer liability on the principal client[9] and its subcontractor in the construction industry.

## IV. ANALYSIS

This case revolves around whether independent contractors at the Project may be "treated . . . as a part of" SCANA, the "contracting company." 20 C.F.R. § 639.3(a)(ii)(2). If so, both

---

[8] Although the term "single employer" does not appear in the text of the WARN Act or its regulations, the DOL Factors "were adapted from other [various] tests developed for intercorporate liability[.]" *Pearson*, 247 F.3d at 491.

[9] The court uses the terms "principal client" or "contracting company" throughout the Order largely in relation to SCANA's role in the instant case. As noted above, SCANA, as the principal client and contracting company, hired WEC to be a contractor on the Project. WEC in turn hired Fluor as a subcontractor.

10

SCANA and Fluor may well be liable as a single employer for failing to give 60 days' notice of the Project's closure. The court begins with an analysis of whether SCANA and its contractors amounted to a single employer under the WARN Act's DOL Factors. The court thereafter examines Fluor's liability as a separate employer under the WARN Act, reviews Plaintiffs' request for the court to take judicial notice of certain documents, and concludes with a brief examination of policy considerations.

A.  **WARN Act Single Employer Liability Under the DOL Factors**[10]

Defendants posit the DOL Factors are wholly inapplicable to contractors, as the DOL Factors "clearly require some form of [shared] ownership."[11] (ECF No. 215 at 11.) SCANA further asserts that as a threshold matter, two entities must be "highly integrated" regarding their

---

[10] The court observes that, since its denial of SCANA's Motion to Dismiss and the substantial progression of discovery, many of Plaintiffs' allegations have been proven untrue, which in turn impacts the court's analysis of the DOL Factors. (*See* ECF No. 109 (*Pennington*).) Additionally, SCANA stresses that after discovery, Plaintiffs have shifted the basis of their theory of single employer liability. Initially Plaintiffs claimed SCANA implemented an owner-directed model after WEC's bankruptcy which made SCANA a single WARN employer with its contractors. Now, however, Plaintiffs point to SCANA's actions *before* implementing an owner-directed model, including compliance with the EPC Agreement and other regulations, and actions beyond the EPC Agreement that established single employer liability. Yet SCANA asserts this theory of liability is not pleaded in the Amended Complaint. (ECF No. 41 (*Pennington*).) The court observes that, post discovery, it is now undisputed SCANA never implemented an owner-directed model at the Project. Further, the Amended Complaint contains allegations that "SCANA began taking ownership of operational decision-making to *give effect* to the owner-directed model." (*Id.* at 11 ¶ 62 (*Pennington*) (emphasis added).) Although such allegations, including those concerning the EPC Agreement, are sparse, the court finds the pleading contains sufficient allegations to support Plaintiffs' claims.

[11] Fluor relatedly contends the DOL Factors are not applicable and, instead, the court should apply more traditional tests regarding alter ego and veil piercing. Yet the court finds this argument without merit as it previously rejected this claim in its Order denying Defendants' Motion to Dismiss. (ECF No. 109 at 10 (*Pennington*).) Moreover, applying the DOL Factors appears "the most prudent course" for WARN Act claims given the historical complexities and difficulties in this area of the law, as well as because the factors "were created with WARN Act policies in mind and . . . focus particularly on the circumstances relevant to labor law." *Pearson*, 247 F.3d at 489-90.

11

ownership <u>and</u> operation. (*Id.* at 12.) *Pearson* does indeed mention it is necessary to prove the DOL Factors of ownership and operations between two entities. 247 F.3d at 505 ("The DOL [F]actors, like the integrated enterprise test, require that two corporations be 'highly integrated with respect to ownership and operations' before they will be considered a single employer for WARN Act purposes."). Yet as subsequent cases have noted, "the *Pearson* court observed that 'a number of facts and circumstances may be relevant' when applying the 'balancing test' of 20 C.F.R. § 639.3(a)(2)." *Likes v. DHL Express*, No. 2:10-CV-2989-VEH, 2011 WL 13230347, at *5 (N.D. Ala. July 26, 2011) (quoting *Pearson*, 247 F.3d at 490). "Therefore, *Pearson* implicitly supports [the] position that the mere absence of an allegation about shared corporate ownership does not automatically render a WARN unified employer claim fatally flawed[.]" *Id.* In the same vein, at least one court has declined to impose this threshold standard of high integration when examining a contractor's relationship with its contracting company. *See Administaff Companies, Inc. v. New York Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 457 (5th Cir. 2003) (noting the shared ownership and shared officers or directors factors were "not at issue" in that case, and completing an analysis under the remaining DOL Factors). Moreover, given the specific reference to "*independent* contractors" in the WARN Act, the court finds it unlikely that the DOL Factors require some threshold showing of ownership, as it seems a contracting company would rarely, if ever, possess an ownership interest in an independent contractor. Consequently, the court turns to examine each of the five DOL Factors to determine whether SCANA and Fluor were a single employer under the WARN Act.

### *(1) Common Ownership*

The common ownership factor "inquires as to whether a parent or related entity directly owns a separate corporate entity." *Guippone v. BH S & B Holdings LLC*, No. 09-CV-1029-CM,

2010 WL 2077189, at *4 (S.D.N.Y. May 18, 2010) (citing *Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 140 (S.D.N.Y. 2004)). Upon review, the court observes there are no allegations in the Amended Complaint that SCANA has a direct ownership interest in WEC or Fluor.

Instead, Plaintiffs allege that SCANA had "financial control" over Fluor and WEC that amounted to common ownership because SCANA owned "the Project and its jobs." (ECF No. 193 at 44.) Yet neither of the cases Plaintiffs rely upon to prove this innovative theory of "financial" ownership go so far as to state that mere ownership of a job site may amount to common ownership of an independent contractor. *See Pearson*, 247 F.3d at 497; *In re Tweeter OPCO, LLC*, 453 B.R. 534, 542 (Bankr. D. Del. 2011). The court likewise declines to do so. Accordingly, even considering this factor in the best light toward Plaintiffs, the common ownership factor does not favor Plaintiffs. *See Administaff*, 337 F.3d at 457.

(2) *Common Directors and/or Officers*

The common directors and/or officers factor "ordinarily looks to whether the two nominally separate corporations: (1) actually have the same people occupying officer or director positions with both companies; (2) repeatedly transfer management-level personnel between the companies; or (3) have officers and directors of one company occupying some sort of formal management position with respect to the second company." *Pearson*, 247 F.3d at 497. "Plaintiffs do not allege that SCANA, WEC[,] and Fluor shared common officers." (ECF No. 193 at 45.) Plaintiffs further claim this factor is immaterial because this case does not involve parents or subsidiaries. (*Id.*) Thus, the court finds that this factor does not favor Plaintiffs. *See Administaff*, 337 F.3d at 457.

*(3) De Facto Control*

Defining the de facto control factor in this case is vital to each party's claims. On the one hand, de facto control in the context of a relationship between a principal contracting client and its contractor has sometimes turned on "whether the business in question has specifically directed the allegedly illegal employment practice that forms the basis for the litigation." *Administaff*, 337 F.3d at 457-58 (citing *Pearson*, 247 F.3d at 491). This so-called "decision maker" rule, which was created in *Pearson*, has generally only otherwise been applied when reviewing parent-subsidiary or lender-borrower relationships.[12] *See, e.g., Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369, 378 (S.D.N.Y. 2017); *Rangel v. Cardell Cabinetry, LLC*, No. SA-13-CA-843, 2014 WL 12540718, at *4 (W.D. Tex. Jan. 17, 2014); *Lace v. Fortis Plastics, LLC*, No. 3:12-CV-363 JD CAN, 2013 WL 5407194, at *6 (N.D. Ind. Sept. 24, 2013); *Young v. Fortis Plastics, LLC*, No. 3:12-CV-364 JD CAN, 2013 WL 5406276, at *6 (N.D. Ind. Sept. 24, 2013); *Guippone v. BH S & B Holdings, LLC*, No. 09 CIV 1029 CM, 2011 WL 6288396, at *6 (S.D.N.Y. Dec. 15, 2011), *vacated on other grounds*, 737 F.3d 221 (2d Cir. 2013); *Pearson*, 247 F.3d at 491 (citation omitted); *Vogt*, 318 F. Supp. 2d at 144 (finding allegations that "parent companies made the decision to effect a mass layoff of [the subsidiary's] employees with no regard for the statutory warning time" were sufficient to show the parents "disregard[ed] the separate legal personality of [the] subsidiary in directing the subsidiary to act").

On the other hand, cases involving contractors, rather than parents or lenders, in some instances have limited their review of de facto control to examining considerations such as

---

[12] The parties further contest the applicability of the *Esmark* Rule, which states that a "striking" decision or exercise of control may warrant liability even without support from the other factors. *See Pearson*, 247 F.3d at 504 (citation omitted). Yet as discussed herein, SCANA's decision to close the Project was insufficient, by itself, to exert control over Fluor in this specific instance.

managerial control; supervision of employees; how employees are paid; and how employees are

hired and fired. *See Martin-Smith v. Ramcor Servs. Grp., Inc.*, No. 2:10-CV-00403-PMP, 2012

WL 4472036, at *5 (D. Nev. Sept. 25, 2012); *Reyes v. Greater Tex. Finishing Corp.*, 19 F. Supp.

2d 709, 713 (W.D. Tex. 1998).

Plaintiffs' contentions that SCANA exerted de facto control over Fluor and WEC for single

employer WARN liability are essentially two interrelated components: SCANA's decision to end

the Project in and of itself;[13] and the allegedly high level of operational integration between

SCANA and its contractors at the job site throughout the Project. The parties dispute whether the

decision maker rule applies outside parent-subsidiary or lender-borrower relationships. And if

applicable, they further dispute whether the employment practice giving rise to this litigation was

SCANA's decision to close the Project or Fluor's subsequent decision not to send notice pursuant

to WARN.

Defendants posit that Plaintiffs' theory would make a principal client dealing at arms-

length with its independent contractor liable as a single employer under the WARN Act simply

---

[13] Plaintiffs attempt to distinguish several cases involving a plant closure or mass layoff wherein no entity was liable for failing to give WARN notice within 60 days by claiming "the shutdowns in those cases were ordered by federal or state governmental entities[.]" (ECF No. 207 at 27 n.130 (citing *Deveraturda*, 454 F.3d at 1048; *Elsinore Shore Assocs.*, 173 F.3d 175; *Holliday*, 2011 WL 13186050).) Fluor construes this contention as Plaintiffs "stating government entities cannot be a single employer," which Fluor observes is incorrect. (ECF No. 209 at 7-8 n.4 (citing *Holliday*, 2011 WL 13186050, at *7 ("The key question . . . is who ordered the plant closing. Given that the government made the decision to close the [plant] and defendant merely responded to this order by laying off its employees who worked there, the Court finds as a matter of law that the WARN Act does not apply.")).) Fluor appears to make this point to smother any implication that, but for the government being a principal client, Plaintiffs' cited cases would have found WARN single employer liability between the principal client and its contractors. It seems Plaintiffs' assertion is narrower in scope than Fluor suggests. Regardless, the court observes Plaintiffs' cited cases do not examine single employer WARN liability involving the government, and Plaintiffs otherwise offer no single employer WARN Act cases suggesting the result would have been different if the government had not been the principal client.

because the principal closed a job site. (ECF No. 204 at 9.) To that end, Plaintiffs retorted orally

at the December 2, 2020 motions hearing that liability between an independent contractor and its

contracting company after the latter closed a job site turned on whether "the independent contractor

had already allowed itself to be [sufficiently] integrated into the workings of the site." (Unofficial

Tr. 102:25-103:22 (Dec. 2, 2020 motions hearing).) "Once [the entities are] in that integrated kind

of space, then, yes, you are going to be subject to liability if you do nothing when that contracting

owner shuts down[.]" (*Id.* at 103:18-20.) Thus, Plaintiffs at least seemed to suggest at the hearing

that SCANA's closure of the Project alone might have been insufficient for de facto control

without adequate integration, despite arguing to the contrary in their briefing. (*See* ECF No. 193

at 30 ("SCANA's furtive plant closure is, alone, sufficient grounds to hold it liable[.]").)

Reviewing the circumstances surrounding the Project, the non-exhaustive list of DOL

Factors, and Plaintiffs' statements at the hearing, the court observes the issues raised by both sides

are relevant to de facto control. Thus, the court finds it prudent to examine Plaintiffs' allegations

of SCANA's alleged de facto control.

The court begins by reviewing the de facto control on the job site. Plaintiffs claim

SCANA's control "pervaded the day-to-day work over the course of the [P]roject." (ECF No. 193

at 39.) Plaintiffs point out that, "[a]s the [Nuclear Regulatory Commission] licensee of the

[P]roject, SCANA was required by law to control WEC and Fluor." (*Id.*) Specifically, "when

SCANA told WEC or Fluor that a particular condition was noncompliant, they corrected it. Every

time." (*Id.* at 40.) Beyond compliance with regulations, Plaintiffs state SCANA "influenced the

sequence of construction and time-saving measures"; "considered itself responsible to oversee

WEC and Fluor's business practices, as codified in the EPC [A]greement"; and could assign tasks

and gave directions on "how to do business" to WEC; while "contractor employees understood

they were to follow SCANA's suggestions as if they were directions." (*Id.* at 40-41.) Crucially, Plaintiffs claim "SCANA's control expanded and became more explicit" after WEC's bankruptcy.[14] (*Id.* at 41.) Defendants counter that neither compliance with regulations in a highly regulated industry nor contractual compliance with an agreement executed after arms-length bargaining demonstrates control for single employer liability under the WARN Act in this case. (ECF No. 204 at 4, 26-27.)

Here, the court finds no genuine dispute that SCANA's control of Fluor and WEC was largely within the expected bounds of a principal client's relationship with its hired contractor or subcontractor. While SCANA did direct its contractors to remedy certain issues, these matters almost always amounted to compliance within the highly regulated industry of nuclear power, as Plaintiffs seem to admit. (ECF No. 193 at 39 ("[W]hen SCANA told WEC or Fluor that a particular condition was noncompliant, they corrected it. Every time.").) The court declines to find that a principal client's mere compliance with regulations[15] or the ECP Agreement in an industry rife with highly invasive regulations is evidence of de facto control. *See also Martin-Smith*, 2012 WL 4472036, at *6 (holding that "to the extent rules and regulations pertaining to the job were identical" between two contractors, such rules "emanated from the VA's requirements under the contract, not from the integrated nature of the two companies").

Outside of regulatory or contractual compliance, numerous witnesses (including many of Plaintiffs) agree that SCANA did not directly supervise or manage its contractors' employees, or direct or control how WEC and Fluor performed work at the Project. (ECF No. 192-11 at 29:20-

---

[14] As pled in the Amended Complaint, Plaintiffs' claims hinge on SCANA's interactions with Fluor after WEC's bankruptcy. (*See* ECF No. 41 (*Pennington*).)
[15] Such compliance efforts appear to have largely encompassed the work of SCANA's New Nuclear Deployment group. (ECF No. 211 at 3-4.)

24; 40:5-17; 41:7-43:23; 61:9-62:1; & ECF No. 204-11 at 57:8-14; 67:25-68:6 (WEC employee David Durham stating SCANA had no authority or direct control of WEC's or Fluor's performance of duties or employees, and that SCANA had no role "over day-to-day construction activities at the site" both before and after WEC's bankruptcy)); (ECF No. 192-12 at 30:25-32:3; 33:1-35:19; 37:7-21; 53:8-17 (WEC employee William Macecevic, III stating SCANA did not "control[] the manner and means in which the design and construction work was done and performed" by WEC and Fluor; SCANA did not set its contractors' employees' work schedules; WEC completed employee evaluations for its employees; and SCANA's relationship with its contractors did not materially change after WEC's bankruptcy)); (ECF No. 204-4 at 165:5-16 (Tim Lorentz stating he never observed SCANA employees "in the field directing any Fluor craft or foreman or general foreman about how they're supposed to do construction activities" both before and after WEC's bankruptcy)); (ECF No. 204-5 at 36:2-37:4; 48:15-49:19; 56:8-12; 113:10-23; 210:3-17; 255:18-24; & ECF No. 204-12 at 44:6-10; 49:3-23; 60:10-21 (WEC employee Rodney Cavalieri stating he "took day-to-day direction from [WEC]"; SCANA  never "directed or controlled" how WEC or Fluor performed their work "from any perspective"; Fluor supervisors and managers directly supervised and directed the work of Fluor employees; SCANA never "assumed complete control over all significant decisions made from the ground level up on the [Project]"; no WEC employee ever reported SCANA taking such complete control to him; and, in his opinion, SCANA lacked the personnel and expertise to take such control)); (ECF No. 204-7 at 42:24-46:6; 78:8-22 (Fluor employee Thomas Sauer stating his direct supervisor was always a Fluor employee; no SCANA or WEC employees ever supervised or directed his work; he never supervised any SCANA or WEC employees; and SCANA was not involved in Fluor's hiring of additional field engineers)); (ECF No. 204-8 at 51:13-52:14; 55:3-18; 56:10-13; 63:23-64:6 (Fluor employee Dewaii Tate

stating his direct supervisor was a Fluor employee; all of the approximately 60 individuals Tate supervised were Fluor employees; SCANA never "directly supervised [Tate's] work or [gave him] day to day instructions"; and SCANA never directly supervised his work crew)); (ECF No. 204-9 at 60:17-20; 116:4-9 (Fluor employee Lawrence Butler stating neither SCANA nor WEC supervised his work or gave him daily instructions; his work activities did not change after WEC's bankruptcy; and, to his knowledge, none of Fluor's other employees' work activities changed after WEC's bankruptcy)); (ECF No. 204-13 at 181:4-12 (Fluor EVP Garry Flowers stating WEC ran "the craft [and ran] the workers. So if somebody want[ed] to slow [the Project] down, they need[ed] to officially have [WEC] tell us that," and noting WEC only ever told them to "work faster")); (ECF No. 204-14 at 69:10-21; 100:17-20 (Lakeisha Darwish stating no SCANA representative ever gave Darwish day-to-day work instructions, and that Darwish retained the same supervisors before and after WEC's bankruptcy)); (ECF No. 204-15 at 85:21-86:9; 89:18-21 (Harry Pennington stating his direct supervisors were Fluor employees while he was employed with Fluor, and that SCANA employees never directed Pennington how to perform his job)); (ECF No. 204-16 at 56:25-57:6, 75:13-25, 84:3-85:9 (Fluor employee James Bland stating SCANA never directly supervised his work; the work activities of himself and other Fluor employees did not change after WEC's bankruptcy; and SCANA's role was that of oversight, a "bean counter" that "verify[ed] the commodities were installed" rather than "telling [Fluor] how to install it or when to install it")); (ECF No. 204-17 at 82:21-83:6; 128:19-129:21 (Fluor employee Sean Donahoe stating he reported to a Fluor employee, and not a SCANA employee; SCANA did not supervise his work; and he was unaware of any SCANA representative "directly supervising anyone in [his] chain of command," including his crew, foreman, and general foreman)); (ECF No. 204-18 at 26:4-15; 128:20-129:5 (Brian Dunne stating he reported to a Fluor employee; SCANA did not direct his

work; and he never reported to a SCANA supervisor)); (ECF No. 204-19 at 46:5-17; 50:4-7; 66:10-67:8 (Fluor employee Jimi Sutton stating he and his crew of ten to twelve individuals reported to a Fluor supervisor, and Fluor employees gave him day-to-day direction)); (ECF No. 204-20 at 30:2-31:5 (Fluor employee Kimberly Bentz stating everyone in her chain of command was a Fluor employee)).

Likewise, SCANA did not "have any role as to the job-specific training" conducted by Fluor or WEC. (ECF No. 195-10 at 154:10-23.) SCANA's Vice President of Human Resources further testified that SCANA was prohibited from directing any contractor work at the Project and a SCANA employee "could be fired for doing" so. (ECF No. 204-10 at 120:19-121:2.) While SCANA required WEC and Fluor to follow "good business practices, reliability, economy, and safety," such directives are not indicative of overt control. (ECF No. 193-3 at 29:7-30:11.) Plaintiffs admit "[t]he first line of management and the day-to-day supervision came from the Project's 'field non-manual' organization, a mix of WEC and Fluor staff headed by WEC's Site Director, Carl Churchman." (ECF No. 193 at 8.)

Although SCANA paid Fluor directly after WEC's bankruptcy—just as a principal client would be expected to pay its contractor—SCANA never issued paychecks to employees of either Fluor or WEC.[16] (ECF No. 192-3 at 102:22-25); (ECF No. 192-23 at 51:23-52:16); (ECF No. 192-24 at 49:15-18; 58:3-4; 117:18-118:6); (ECF No. 192-26 at 49:18-50:4); (ECF No. 192-27 at 42:7-12)); (ECF No. 192-28 at 46:7-15, 58:20-25); (ECF No. 192-29 at 49:6-18, 72:24-73:1); (ECF No. 204-5 at 152:3-13); (ECF No. 204-15 at 75:14-21; 131:12-17); (ECF No. 204-20 at 57:18-21).

Further, many portions of testimony narrowly cited by Plaintiffs for support are better understood in the broader context of the overall record. For example, much of Plaintiff Keen's

---

[16] The United States Bankruptcy Court approved such payments. (*See* ECF No. 192-5.)

testimony seems to support Defendants' position, despite Plaintiffs' reliance to the contrary. Keen, an employee of Fluor, understood she was not a SCANA employee, did not have access to SCANA's personnel policies, reported to the HR Department within Fluor, and received benefits from Fluor. (ECF No. 204-6 at 79:10-81:17.)  Keen likewise took daily direction from Fluor and, if asked to do something different by SCANA, would contact Fluor for guidance and resolution. (*Id.* at 25:3-6; 31:9-16.) Another employee relied upon by Plaintiffs—Plaintiff Lorentz—testified that WEC made the final engineering and design decisions, even though SCANA sometimes made suggestions. (ECF No. 204-4 at 59:9-12, 140:3-14, 142:3-14.) Much of Plaintiffs' other cited testimony is either addressed above or supports allegations that SCANA ensured regulatory and contractual compliance, which, in the instant case does not rise to de facto control. (*See* ECF No. 193 at 6-23.) When viewed as a whole, Plaintiffs' assertions simply do not raise a genuine dispute of material fact as to the alleged de facto control by SCANA.

Plaintiffs claim that SCANA's control over its contractors escalated beyond arms-length dealings after WEC's bankruptcy are likewise unpersuasive. The EPC Agreement—executed between SCANA and WEC in 2008—remained in effect even after WEC declared bankruptcy in 2017. There is no allegation SCANA breached the bankruptcy court's order, which mandated the EPC Agreement remain in place, by exerting untoward control over Fluor. (*See* ECF No. 192-5 at 8.) While it appears SCANA's relationship with WEC and Fluor changed somewhat after WEC's bankruptcy, it nonetheless remained far afield of SCANA exerting de facto control over its contractors. For instance, SCANA, in accordance with the IAA, began paying Fluor directly, which is hardly indicative of control. Even if SCANA assumed certain duties from WEC, such as becoming responsible for the Project's costs; "directing the [Project's] schedule going forward"; and dealing directly with vendors, these acts did not exert de facto control over Fluor or WEC such

that the contractors' separate corporate identities were disregarded. (ECF No. 193 at 17-19.) Indeed, there appears to be no contractual relationship whatsoever between SCANA and Fluor, as WEC hired Fluor as its subcontractor in 2016 and continued to work on the job site up to the Project's closure. And while SCANA intended to transition to an owner-directed model that could have indeed invoked liability under the WARN Act, it is undisputed SCANA terminated the Project before doing so. In short, it appears SCANA's relationship with Fluor and WEC on the Project did not expand beyond a normal affiliation between independent contractors and the contracting company, particularly in a highly regulated industry.

While some evidence of de facto control purportedly exists within the terms of the EPC Agreement, it does not outweigh the bulk of evidence to the contrary and falls far short of validating Plaintiffs' claims of wholesale control. For instance, it seems SCANA had at least some ability to approve certain of WEC's and Fluor's management hires. (ECF No. 191-5 at 38:2-22; 41:2-24.) But for all other employees, WEC and Fluor ultimately decided who they wanted to hire for the Project. (ECF No. 191-10 at 153:9-16); (ECF No. 192-3 at 103:1-6); (ECF No. 192-11 at 41:7-43:13; 53:15-25); (ECF No. 192-12 at 22:15-18; 34:25-35:12); (ECF No. 204-5 at 176:22-177:21; 254:6-255:13); (ECF No. 204-21 at 296: 2-15). Relatedly, SCANA could seek the removal of a contractor's employee from the Project for any reason, but it had no authority to fire or otherwise impact that employee's employment with the contractor. (ECF No. 191-5 at 256:3-23.) *See also Reyes*, 19 F. Supp. 2d at 713 (explaining that two corporations which "handled separately the hiring and firing of employees" was evidence of no de facto control). SCANA's ensured compliance with the EPC Agreement and governmental regulations is insufficient to exert de facto control over Fluor in this particular case.

Other alleged evidence of control is insubstantial. When disciplinary issues arose with Fluor's or WEC's employees, the fact SCANA was sometimes tangentially involved is not dispositive evidence of de facto control. (ECF No. 195-10 at 236:19-237:6; 281:21-282:19.) Nor are Plaintiffs' allegations that SCANA regularly participated in various meetings, maintained "direct oversight" over the Project, and issued a number of "condition reports." (ECF No. 193 at 7, 13-15.) Likewise, simply because SCANA at one point suggested that the contractors "[l]ook elsewhere, find other means of bringing people in," after expressing dissatisfaction with recruitment does not rise to the level of control necessary for single employer liability under the WARN Act. (ECF No. 191-18 at 71:6-72-9.)

Plaintiffs further claim SCANA capped Fluor's overtime, on at least one occasion directed Fluor to begin a concrete pour on Tuesday rather than Thursday to avoid overtime pay, and suggested when certain of Fluor's employees could take vacation. (ECF Nos. 193 at 18-20, 43; 211 at 11-12.) Plaintiffs relatedly allege Fluor could not increase at least some of its workforce without SCANA's prior approval. (*Id.* at 18-20, 43.) But even assuming these allegations are true and relevant to this factor,[17] the court finds such evidence is more indicative of SCANA's attempt to control costs at the Project rather than the continuous exercise of managerial control; supervision of employees; or manner in which employees were paid, hired, and fired. *See also Martin-Smith*, 2012 WL 4472036, at *5; *Reyes*, 19 F. Supp. 2d at 713 (finding a lack of de facto control where two corporations "engaged in no . . . employee activities with regard to [the other's] operations" besides a "few personnel matters" including "making complaints about vacation pay and receiving employee badges, employment letters, and final pay checks").

---

[17] Plaintiffs have pointed to no other cases where such considerations supported de facto control.

Next, the court turns to the impact of the decision maker's rule in this case. As mentioned *supra*, the parties dispute which employment practice gave rise to the instant litigation: Plaintiffs point to SCANA's decision to terminate the Project, while SCANA contends the case arose from Fluor's subsequent failure to comply with the WARN Act. Even assuming the employment practice giving rise to the instant litigation was SCANA's abrupt termination of the Project,[18] the court finds this decision, without more, is insufficient to weigh this factor in Plaintiffs' favor. As listed *supra*, nearly every other case applying the decision maker rule and examining which entity closed a plant to determine de facto control involved parents and subsidiaries or lenders and borrowers. Unlike relationships involving independent contractors, such affiliations must often clear the threshold matter of high integration to be liable under the WARN Act as a single employer, including with ownership and operations. *See Pearson*, 247 F.3d at 505.

Yet as the court found above, contractors need not clear these threshold hurdles because the relationship between an independent contractor and a contracting company differs in some respects from parents or lenders. For instance, an independent contractor would rarely, if ever, share ownership with its contracting company—hence the term "*independent* contractor" as it appears in the WARN Act. And as examined both *infra* and *supra*, Defendants' operations here were not integrated beyond a normal business relationship in a highly regulated industry.[19] The

---

[18] The court notes its doubts with Plaintiffs' contended employment practice at issue. For instance, had SCANA in fact provided Fluor with sufficiently advanced notice of the Project's closure, and in response Fluor failed to issue 60 days' notice pursuant to the WARN Act to its employees, it appears to the court that Fluor's lack of notice—and not SCANA's site closure—would clearly be the employment practice at issue, even though their overall level of integration remained the same. To hold otherwise in that hypothetical would apportion fault to SCANA where none existed. In any event, the court need not decide which argument prevails because under either theory the result remains the same: this factor favors Defendants.

[19] Further, the case cited by Plaintiffs that applied the decision maker rule to a contractor limited its analysis to one sentence and found the contractor was not liable under the WARN Act. *Administaff*, 337 F.3d at 457-58.

24

court is unwilling to assert that SCANA's rapid Project closure, without more, established de facto control over the independent contractor status of Fluor or WEC. To hold otherwise would likely deform the WARN Act well beyond Congress' intent and could open a floodgate of litigation against principal clients who are wholly independent from a contractor or subcontractor. No court has ever issued the expansive decision envisioned by Plaintiffs, and this court declines to do so.[20]

At bottom, this factor favors Defendants. SCANA did not exert control over Fluor or WEC beyond what would be expected between an independent contractor and a principal client, particularly in a highly regulated industry. Even assuming the employment practice giving rise to the instant litigation was SCANA's Project closure, this closure alone is insufficient to establish de facto control over an otherwise independent Fluor.

### (4) Unity of Personnel Policies

The unity of personnel policies factor "is analogous to the aspect in the federal labor law test concerning 'centralized control of labor operations,'" and includes such elements as "centralized hiring and firing, payment of wages, maintenance of personnel records, benefits and participation in collective bargaining." *Vogt*, 318 F. Supp. 2d at 142-43. In essence, this factor

---

[20] Plaintiffs rely heavily on *Local 217*, a Second Circuit decision, to support their position that the decision maker rule is applicable to contractors, and the employment practice at issue is a job site's abrupt closure. *Local 217, Hotel & Rest. Employees Union v. MHM, Inc.*, 976 F.2d 805, 808 (2d Cir. 1992). Yet the Second Circuit ultimately dismissed that case's WARN Act claim because the relief sought—an injunction—was not an available remedy under the WARN Act. *Id.* at 808-09. Thus, the reasoning upon which Plaintiffs heavily rely is simply dicta. Moreover, even if the court were inclined to depend upon this persuasive authority, at least one other Circuit has observed additional problematic implications of the dicta within *Local 217*. *See Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, Gen. Truck Drivers, Office Food & Warehouse Local 952 v. Am. Delivery Serv. Co.*, 50 F.3d 770, 777 (9th Cir. 1995) (declining to follow *Local 217* because "the fact that [*Local 217*] does not even mention the unforeseeable business circumstances exception makes its authoritativeness questionable," while noting such a holding would "render the unforeseeable business circumstances exception virtually ineffective") (citation omitted).

examines "whether the companies actually functioned as a single entity with regard to its relationship with employees." *Pearson*, 247 F.3d at 499.

Plaintiffs again contend SCANA unified its personnel policies with its contractors in two ways: first, by terminating the Project because this decision alone laid off thousands of its contractors' employees; and second, by various other actions taken throughout the Project after WEC's bankruptcy. (ECF No. 193 at 42-43.) Plaintiffs seem to rely upon much of the same evidence offered and argued under the de facto control factor.

In response, SCANA again points to its contractors' failure to give WARN notice after the Project's closure, rather than SCANA's decision to terminate the Project. (ECF No. 204 at 27-28.) In that vein, SCANA asserts "[t]here is absolutely no evidence that SCANA made decisions about whether WEC or Fluor would provide notice to their respective employees or what would happen to their employees at the conclusion of the Project." (*Id.* at 27.) SCANA further stresses that, throughout the Project, it did not have unified personnel policies with its contractors. (ECF Nos. 192-1 at 15-16; 204 at 27-31.)

For the reasons discussed above, the court believes it prudent to examine both the unity of personnel policies at the Project as well as the impact of SCANA's decision to close the Project itself.

As to the Project, the court finds that the personnel policies of both SCANA and its contractors were not sufficiently unified to constitute a WARN single employer. As previously examined, SCANA did not hire, fire, or pay wages to employees of either Fluor or WEC. Moreover, Plaintiffs admit "[f]or the most part . . . that WEC and Fluor filled the 'nominal' employer role for their employees." (ECF No. 211 at 13.) This concession apparently covers the

undisputed facts that SCANA did not share its human resources department with its contractors and did not pay employment benefits to its contractors' employees.

Further, at least nine witnesses' testimony, including many of Plaintiffs, explained that SCANA's employee handbook and other related policies were not provided or did not apply to the contractors' employees. (ECF No. 192-2 at 106:17-20 (Pennington was never "given any policies and procedures that covered SCANA employees while . . . working on site")); (ECF No. 192-3 at 101:23-102:14 (WEC had "its own policies and procedures that governed employees [and] employee relations," and SCANA and Fluor never provided Lorentz with an employee handbook)); (ECF No. 192-31 at 139:20-23 (SCANA never "provided any SCANA handbooks, policies, or benefit plans" to Fluor employee Dunne));  (ECF No. 192-23 at 55:7-9 (SCANA or WEC never provided Butler with a handbook)); (ECF No.192-26 at 51:22-52:3 (Fluor employee Bland never "receive[d] a SCANA handbook" or "any SCANA employment policies")); (ECF No. 192-28 at 49:20-25 (Sauer "received a Fluor [P]roject handbook" but not a "SCANA employee handbook")); (ECF No. 192-29 at 68:23-69:11 (Fluor employee Tate received workforce guidelines from Fluor but did not "receive an employee handbook or workforce guidelines or anything like that from any other company other than Fluor")); (ECF No. 204-17 at 100:10-22 (Fluor employee Donahoe acknowledging his own signature that made "Fluor policies . . . applicable to [his] employment with Fluor[.]")); (ECF No. 204-20 at 173:18-23 (Fluor employee Bentz was not "subject to any SCANA employee handbooks when [she] worked at the [Project.]")).

In an attempt to dispute the above evidentiary record that SCANA's employment policies were inapplicable to its contractors, Plaintiffs cite to Fluor's subcontract requiring in part that Fluor's personnel

> comply with . . . all rules, regulations[,] and policies of [WEC] and [SCANA] that
> are communicated to [Fluor] in writing, including security procedures concerning
> systems and data and remote access thereto, building and Site security procedures,
> including the restriction of access to certain areas of its premises or systems for
> security reasons, and general health and safety practices and procedures[.]"[21]

(ECF No. 190-19 at 16 (section 2.02(g)).) Yet Plaintiffs do not provide, cite to, or specify any

policies promulgated under this section that tend to show unified personnel policies.[22]

Relatedly, while SCANA maintained its own Employee Concerns Program ("ECP") for

any Project employee to voice safety concerns both before and after the WEC bankruptcy, this

program is insufficient to show a unification of personnel policies. (*See* ECF No. 193-3 at 94:6-

95:18 (explaining the ECP was "part of the nuclear safety culture requirement for the nuclear

industry to have [an] alternate way to raise concerns. [The regulations] actually [don't] specify

how you do it. That was the way that [SCANA] chose to have an employee concerns program").)

Plaintiffs point out that, after WEC's bankruptcy, "Fluor submitted weekly estimates of its

costs directly to SCANA before the work was done, including itemized breakdowns of straight-

time and overtime pay for its employees. SCANA had the authority to deny any portions of those

costs." (ECF No. 193 at 18 (internal citations omitted).) But controlling such costs does not relate

to "centralized hiring and firing, payment of wages, maintenance of personnel records, benefits[,]

---

[21] Plaintiffs also allege "SCANA had approval authority over all work rules applicable to Fluor
employees[.]" (ECF No. 205 at 39-40 (citing ECF No. 192-8 at 100-01 (section 24.2)).) But it
appears the referenced section of the EPC Agreement in fact states in part that "Contractor shall
submit to Owner for approval a set of work rules that applies to all Contractor
and Subcontractor employees. This set of work rules shall establish Contractor's and
Subcontractor's disciplinary action policy and hiring and termination policy." (ECF No. 192-8 at
100-01 (section 24.2).) This section thus does not appear to cover "all work rules applicable to
Fluor employees," as claimed by Plaintiffs. Nor do Plaintiffs cite to, produce, or specify any policy
promulgated under this section that tends to show a unification of personnel policies.
[22] The court further observes the examples listed in Fluor's subcontract primarily concern health
and safety policies, rather than any examples focused on employees and personnel. (*See* ECF No.
190-19 at 16 (section 2.02(g)).)

and participation in collective bargaining." *Vogt*, 318 F. Supp. 2d at 142-43. It is thus clear Defendants lacked the "centralized control of labor operations" during the Project necessary to prove this factor. *Id.*

Indeed, SCANA and Fluor are in two entirely different industries: SCANA is a utility company that provides South Carolinians with electricity, while Fluor is a "global engineering and construction company." (ECF No. 41 at 5, 7 ¶¶ 24, 37.) This fact alone makes it "seem[] unlikely that Plaintiffs could ever demonstrate an integration of operations satisfying the unity of personnel policies factor." *In Re Consol. Bedding, Inc.*, 432 B.R. 115, 122 (Bankr. D. Del. 2010) (noting the difficulty in demonstrating unified personnel policies between an investment company and a mattress manufacturer based solely on their different industries). The court accordingly finds Defendants did not share unified personnel policies at the Project.

Next, the court turns to whether SCANA's decision to close the Project itself unified the personnel policies between SCANA and Fluor. For substantially the same reasons as discussed above, the court finds that, even assuming the employment practice at issue was SCANA's Project closure, the closure alone did not sufficiently unify Defendants' personnel policies to weigh this factor in Plaintiffs' favor.

It is true at least some persuasive authority, on its face, suggests that SCANA's Project closure alone could be enough to unify Defendants' personnel policies. For instance, in *Vogt*, the court found that "[i]n the context of the WARN Act, the decision to effect a mass layoff is the single most important personnel policy." *Vogt*, 318 F. Supp. 2d at 142-43. Yet *Vogt* dealt with an investment group that owned a manufacturer of outboard engines and allegedly "directed the [manufacturer] to enter bankruptcy and shut its facilities." *Id.* at 144. The investment group also

purportedly coordinated with the manufacturer's CEO regarding the bankruptcy filing, maintained common ownership over the manufacturer, and shared board members. *Id.* at 142, 144.

Here, by contrast, any such level of integration between Fluor and WEC, both independent contractors, and SCANA is simply absent from the record. As SCANA's and Fluor's personnel policies were not unified on the Project, the court consequently finds SCANA's Project closure alone is insufficient to unify its personnel policies with those of its independent contractors. If the court were to follow Plaintiffs' theory, it would seem any principal client's hire of an otherwise independent contractor would unify their personnel policies (not to mention the exercise of de facto control) by simply closing the job site, or at least by abruptly closing the job site without giving prior warning to the independent contractor. As discussed above, no court has expanded the WARN Act to that effect, and this court declines to do so.[23]

### (5) Dependency of Operations

In some cases, the dependency of operations factor "addresses three areas of overlap between related corporations: (1) sharing of administrative or purchasing services, (2) interchanges of employees or equipment, or (3) commingled finances." *Guippone*, 2010 WL 2077189, at *6 (citation omitted). But in other cases, courts look beyond an individual job site to see if two entities are otherwise dependent on their continued operations. *See Martin-Smith*, 2012 WL 4472036, at *6 (observing two companies were not codependent because their respective operations went "well beyond" the contract at issue, and outside of that contract, the companies had no relationship,

---

[23] As discussed below, if an employer fails to provide 60 days' advanced notice before a layoff or closure, liability pursuant to the WARN Act may not attach if the business circumstance necessitating the layoff was unforeseeable. 29 U.S.C. § 2102(b)(1)(2)(A); 20 C.F.R. § 639.9(b). Plaintiffs' theory of single employer liability would seem to severely weaken this exception and contravene Congressional intent, as an independent contractor would always amount to a single employer (and thus be liable) with its principal client if the client closed a plant, even if the shutdown was reasonably unforeseeable.

"much less a dependency relationship"); *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008), *as amended* (Oct. 27, 2008) (explaining "there is no stronger evidence for . . . [a lack of codependence] than that APA Truck Leasing continued to operate without incident after APA Transport folded").

Plaintiffs focus narrowly on the Project to assert Defendants' operations "were wholly dependent on one another for the successful construction of the Project." (ECF No. 193 at 47.) In essence, Plaintiffs seek to show codependent operations at the Project because SCANA "had the right to direct and control the manner in which [its contractors] undertook their duties." *Pearson*, 247 F.3d at 501. Such arguments again seem similar to those posed for de facto control. By contrast, Defendants claim their operations were not dependent at the Project, and argue the court should look beyond the Project, as they are otherwise completely separate entities in completely different industries. (ECF No. 204 at 33-35.) The court finds it prudent in this case to look to the dependency of operations both at the Project and beyond it.

Here, the court finds this factor favors Defendants. To start, the Project specific dependency of operations was not beyond a normal business relationship, particularly because it concerned building a multi-billion-dollar facility in the highly regulated industry of nuclear power. It does not appear SCANA commingled any funds or shared any employees with WEC or Fluor to reveal dependent operations, as discussed above. Further, the fact that "WEC provided laptops, email addresses[,] and IT access to the majority of Fluor senior management" is not particularly relevant to whether *SCANA* amounted to a single employer with its contractors. (ECF No. 193 at 46); (ECF No. 191-15 at 79:10-18); (ECF No. 193-9 at 24:21-25:8). Plaintiffs likewise have failed to demonstrate that SCANA "shared" other unspecified "equipment." (ECF No. 193 at 46.) And although "a few" SCANA employees apparently maintained "office space" in a building otherwise

occupied by WEC and Fluor, and SCANA "provided facilities . . . for WEC and Fluor" at the Project, which Plaintiffs assert included construction trailers, the court finds such minimal connections are insufficient to show any significant dependency of operations in the instant case.[24] (ECF Nos. 191-15 at 86:5-19; 114 at 14 ¶ 85 (*Pennington*).)

Likewise, the mere fact that SCANA was legally required to comply with extensive regulations, was sometimes "intrusive" when completing quality control checks, and attended regularly scheduled project meetings with its contractors (ECF No. 193 at 49-51) does not support codependent operations. Nor is it decisive that SCANA would review WEC's and Fluor's regulatory interpretations governing their work to ensure legal compliance. (ECF No. 193 at 49.) Indeed, as Plaintiffs admit, "[b]y law, the design, engineering[,] and construction required SCANA's oversight. SCANA's obligations to ensure compliance with the NRC's complex regulations were non-delegable." (ECF No. 193 at 48.) As thoroughly discussed *supra*, the court declines to find compliance with such regulations amounted to dependent operations under the WARN Act. *See also Martin-Smith*, 2012 WL 4472036 at *6.

Outside of the Project, the court observes SCANA and Fluor were wholly independent and unaffiliated companies. Indeed, other than the Project, it appears the only past or current connection between SCANA, WEC, and Fluor is the instant litigation. *See id.* The fact these entities were separate and independent for their respective continued business operations further weighs this factor in favor of Defendants. *See In re APA Transp.*, 541 F.3d at 245. In short, Defendants' operations both at the Project and beyond it were not dependent. This factor thus favors Defendants.

---

[24] SCANA counters there was no exchange of any employees or equipment, nor sharing of any administrative or purchasing services with its contractors. (ECF No. 204 at 34-35.)

*(6) Outcome of DOL Factors Analysis*

After a thorough review of the record, and even in the light most favorable to Plaintiffs, the court concludes that all five factors either weigh in favor of Defendants or do not favor Plaintiffs. Specifically, the DOL Factors of shared ownership and shared officers at a minimum do not favor Plaintiffs. The de facto control of operations, unity of personnel policies, and dependency of operations factors all favor Defendants. While Plaintiffs attempt to highlight evidence or legal theories in their favor (or underscore purported factual disputes) for four of the DOL Factors, the court finds the overall evidentiary record dwarfs this evidence such that no reasonable jury could find for Plaintiffs and, as a matter of law, Defendants are entitled to summary judgment. Given this result, the court must conclude SCANA and Fluor did not act as a single employer for the purposes of the WARN Act. As a consequence, SCANA was not required to give WARN notice to Fluor's or WEC's employees, despite SCANA's abrupt closure of the Project.

**B. <u>Fluor's Liability Under the WARN Act</u>**

*(1) Fluor as a Separate WARN Employer*

The court next turns to Fluor's liability for failing to give 60 days' notice pursuant to the WARN Act to its employees after the Project's termination. Generally, two avenues exist to find an independent contractor liable under the WARN Act, depending on whether the contractor functions: (1) "as a part of the . . . contracting company" (here, as a single employer with SCANA); or (2) "as [a] separate employer[]." 20 C.F.R. § 639.3(a)(ii)(2). As discussed above, the first avenue is unavailing to Plaintiffs because SCANA and Fluor were not a single WARN employer. What remains is whether Fluor may be liable as a separate WARN employer.

As explained above, to be liable under the WARN Act an employer must either order a "plant closing" or "mass layoff" as defined by statute. *See* 29 U.S.C. § 2102(a); *McKinney*, 868 F.3d at 463; *see also Deveraturda*, 454 F.3d at 1049.

It appears Plaintiffs concede that Fluor did not close the Project nor conduct a mass layoff necessary to sustain a WARN Act violation as a separate employer. Plaintiffs state that "Congress required the plant closer to provide notice. *SCANA was that plant closer*. That the Plaintiffs' direct employers, Fluor and WEC, terminated [their respective employees] simply completed SCANA's illegal employment practice *which is the basis of this WARN litigation*."[25] (ECF No. 205 at 35 (emphasis added).) Indeed, Plaintiffs spend considerable time throughout their briefs articulating that the illegal employment practice at issue was SCANA's plant closure, and not Fluor's subsequent lack of WARN notice.[26] Plaintiffs do not argue Fluor was a separate WARN employer in their Motion for Summary Judgment (*see* ECF No. 193), nor in their response to Fluor's Motion for Summary Judgment (*see* ECF No. 207), despite the fact Fluor explicitly contended it was not

---

[25] Further evidence of this admission comes from Plaintiffs' contention that, if Fluor and SCANA were not a single WARN employer, then Fluor would wrongfully escape liability:

> As a matter of law, under the facts of this case as they relate to the inter-relationship of SCANA and Fluor vis-à-vis the Project, Fluor is an "employer" within the meaning of WARN for liability purposes. To hold otherwise would permit any operating company, such as Fluor, to skirt its WARN obligations by claiming it was simply passing on an order from the property owner.

(ECF No. 207 at 23.) And Plaintiffs restate this sentiment in a slightly different manner elsewhere in briefing: "Fluor was the direct WARN employer. SCANA forced the shutdown." (ECF No. 213 at 2.)

[26] Plaintiffs likely avoided briefing this issue because they would have been forced to take contradictory positions: Plaintiffs' theory of single employer liability requires SCANA to have undertaken the employment practice at issue (i.e., the Project's closure); while separate WARN employer liability for Fluor would require Fluor to have undertaken the employment practice at issue (i.e., its subsequent mass layoff and failure to send WARN notice).

a separate WARN employer (ECF Nos. 190 at 26-36; 209 at 5-8).[27] Accordingly, the court

observes the original theory of liability put forth in *Butler* has in all likelihood been waived.[28]

Regardless, even assuming Plaintiffs have not waived this theory of liability, the court finds the

Project's abrupt closure amounted to unforeseeable business circumstances ("UBC") to Fluor,

which relieved Fluor of WARN liability for failing to send a 60-day notice to its direct

employees.[29]

    *(2) Unforeseeable Business Circumstances*

    A WARN "employer may order a plant closing or mass layoff before the conclusion of the

60-day period if the closing or mass layoff is caused by business circumstances that were not

reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. §

2102(b)(1)(2)(A); 20 C.F.R. § 639.9(b).

> "To satisfy these conditions, the defending party must establish that (1) the
> circumstance was unforeseeable, and (2) the layoffs were caused by that
> circumstance." *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009).

---

[27] By way of background, before the court consolidated *Butler* and *Pennington*, *Butler* Plaintiffs
alleged that Fluor was liable under the WARN Act as a separate employer, and Fluor's failure to
send WARN notice before it laid off Plaintiffs violated the Act. (*See* ECF No. 1.) Yet Plaintiffs'
instant Motion for Summary Judgment, which was brought on behalf of *all* Plaintiffs and by *all* of
class counsel in both cases, focuses solely on whether SCANA and Fluor were a single employer
under the WARN Act. Plaintiffs in both *Butler* and *Pennington* are identical, with the only
difference in the two cases being class counsel. As explained *supra*, the court did not designate
any class of Plaintiffs to any particular class counsel.

[28] *See Jenkins v. Pate*, C/A No. 5:15-CV-02241-JMC, 2016 WL 5799313, at *14 (D.S.C. May 26,
2016), *report and recommendation adopted*, 2016 WL 5661700 (D.S.C. Sept. 30, 2016), *appeal
denied*, 722 Fed. App'x 345 (4th Cir. 2018) ("[W]here a party fails to respond to the opposing
party's . . . motion for summary judgment, the party who fails to respond will be found to
have conceded to that argument."); *see also Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016)
(explaining that ignoring an opponent's argument is "an outright failure to join in the
adversarial process [that] ordinarily result[s] in waiver").

[29] Plaintiffs appear to contest whether the Project's closure was an unforeseeable business
circumstance in the context of their single WARN employer theory of liability. (ECF No. 207 at
27-35.) The court largely relies on such arguments to analyze whether the UBC exception applied
to the WARN Act as a separate employer, as the UBC analysis under either theory of liability
would be identical.

> "When confronted with an assertion that the exception applies, a reviewing court must be careful to avoid analysis by hindsight; the trail of harbingers of an unforeseen event always looks brighter in retrospect." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 641 (4th Cir. 1997).

*Messer v. Bristol Compressors Int'l, LLC*, No. 1:18CV00040, 2020 WL 1472217, at *15 (W.D. Va. Mar. 26, 2020).

The test "focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." 20 C.F.R. § 639.9(b)(2). Despite this, "[t]he employer is not required . . . to accurately predict general economic conditions that also may affect demand for its products or services." *Id.* "An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." *Id.*

The WARN Act's regulations list examples of UBC, including:

> **A principal client's sudden and unexpected termination of a major contract with the employer**, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable. A government ordered closing of an employment site that occurs without prior notice also may be an unforeseeable business circumstance.

*Id.* (emphasis added). These regulations thus explicitly contemplate the instant scenario before the court.

The parties fight over defining "reasonable" in the context of UBC. Plaintiffs insist Congress could have included the terms "probable" or "more likely than not" but declined to do so, thus indicating a lower (and unspecified) standard of reasonableness is appropriate. (ECF No. 207 at 29-20.) Yet as asserted by Fluor, numerous Circuit Courts of Appeals reviewing the UBC exception, including the Fifth, Sixth, Seventh, and Tenth Circuits, have found a layoff or closure

must be "probable—that is, when the objective facts reflect that the layoff was more likely than not." (ECF No. 190 at 31 n.138.) In line with these decisions, the court adopts the standard defining reasonableness as probable or more likely than not.[30]

Courts have noted that the specific industry at issue is relevant to exercising commercially reasonable business judgment. In *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Gen. Dynamics Corp.*, the court explained the United States Government's cancellation of a contract to manufacture a certain type of plane with a defense contractor was not reasonably foreseeable because, in the unique context of defense contracting, contracts are often over budget and behind schedule. 821 F. Supp. 1306, 1312 (E.D. Mo. 1993). Further, "the A–12 [plane] was widely perceived as an urgently needed replacement for the A–6E." *Id.* at 1312. The court accordingly found the UBC exception was applicable. *Id.* at 1312-13.

It is undisputed that SCANA waited until the date of the closure on July 31, 2020, to inform Fluor of the Project's termination. Indeed, the parties admit SCANA kept the Project's closure a tight secret limited to a handful of SCANA employees. Despite this, Plaintiffs essentially contend that Fluor was willfully ignorant of the Project's rapidly mounting problems. (ECF No. 207 at 32-

---

[30] *See In re AE Liquidation, Inc.*, 866 F.3d 515, 530 (6th Cir. 2017) ("[A] layoff becomes reasonably foreseeable only when it becomes more likely than not that it will occur."); *United Steel Workers of Am. Local 2660 v. U.S. Steel Corp.*, 683 F.3d 882, 887 (8th Cir. 2012) (UBC exception turns on whether the circumstance was "probable" rather than a "mere possibility"); *Gross*, 554 F.3d at 876 ("[W]e do not rely on the mere possibility that layoffs will occur, but rather look for their probability."); *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589 (7th Cir. 2005) ("Again, the WARN Act deals in reasonable probabilities, not possibilities. Moreover, an employer does not have to be caught completely off guard by a dire business circumstance for it to be 'sudden, dramatic, or unexpected.' Case law reveals that WARN Act defendants need not show that the circumstances which caused a plant closing or mass layoff arose from out of the blue to qualify for the exception."); *Watson v. Mich. Indus. Holdings, Inc.*, 311 F.3d 760, 765 (6th Cir. 2002) (adopting the probability standard instead of the "mere possibility" that a circumstance would occur (citation omitted)); *Halkias*, 137 F.3d at 336 ("We can only conclude that it is the probability of occurrence that makes a business circumstance 'reasonably foreseeable' and thereby forecloses use of the [UBC] exception to the notice requirement. A lesser standard would be impracticable.").

33.) Plaintiffs stress that, although Fluor was hired in 2016 to address delays and cost overruns, such issues became so large that the Project's closure became reasonably foreseeable at some (unspecified) point on or before June 1, 2020. (*Id.* at 33.) Plaintiffs point to a purported "mountain" of other evidence showing the Project's shutdown was probable, including that WEC could not meet its obligations to the Project; Fluor's ETC showed completing the Project would cost significantly more than expected; WEC's bankruptcy put Fluor on notice that SCANA no longer had WEC's "bargained-for crucial fixed-price arrangement," whereby WEC previously agreed to complete the Project at a fixed price; Fluor knew SCANA was "seriously considering" closing the Project in April and May of 2017, depending on what SCANA could afford; after the first IAA end date was extended to June 26, 2017, "Fluor was playing with fire when it ignored that upcoming deadline"; by April 2017, Fluor knew the "critically important" factors SCANA was considering about closing the Project; and Fluor was unwilling to proceed at some point due to scheduling and contractual concerns. (*Id.* at 9-12, 29-30 n.134.) Plaintiffs also take issue with Fluor's mailings in August 2017 concerning notice of the layoff, arguing this notice was not "as soon as practicable" and thus untimely for the purposes of the WARN Act. (*Id.* at 36.)

Fluor contends that it did not order the plant closure and thus cannot be liable under the plain language of the WARN Act. (ECF No. 190 at 27-29.) Even if Fluor was liable for subsequently laying off its employees, Fluor claims the Project's abrupt closure meets the UBC exception. (*Id.* at 29-36.) Fluor stresses the information available to it up to July 31, 2020, indicated that the Project would continue. (*Id.* at 32-36.) Fluor further points to deposition testimony from numerous witnesses stating that the Project's closure was the least likely option going forward. (*Id.* at 34-36.)  Likewise, Fluor observes that SCANA only decided to close the Project *well after* the June 1, 2017 deadline on which Plaintiffs assert Fluor should have sent WARN notice. (ECF

38

No. 209 at 4.) Fluor admits it knew some—but not all—of the problems the Project faced, and disclaims knowledge regarding SCANA's tolerance for additional costs and delays. (*Id.* at 8-10.) Fluor also notes the rapid closure of the Project was unprecedented, and that everyone expected a winding down period at the job site. (*Id.* at 13-14.)

Here, Fluor is not liable for failing to provide 60 days' notice in accordance with the WARN Act. For one, Fluor is not a WARN employer because Fluor did not order the Project's closure. *See, e.g., McKinney*, 868 F.3d at 463 ("Only 'employers' that 'order' a plant closing face regulation by the [WARN] Act or liability under it."); *Holliday*, 2011 WL 13186050, at *7 ("Given that the government made the decision to close the [immigration processing facility] and Defendant[, a security contractor,] merely responded to this order by laying off its employees who worked there, the Court finds as a matter of law that the WARN Act does not apply."); *but see Halkias*, 137 F.3d at 336-37 (explaining a defense contractor's mass layoff *at its own facility*, after the United States Government cancelled a large contract for A-12 planes, invoked the WARN Act, but regardless the contract cancellation amounted to UBC) (emphasis added); *Loehrer*, 98 F.3d at 1062-63 (similar). As it is undisputed that SCANA—and not Fluor—abruptly closed the Project, and in response Fluor was forced to conduct a mass layoff, Fluor does not qualify as an employer under the WARN Act.

Yet even assuming Fluor's mass layoff in response to the Project's closure falls under the WARN Act, the court finds the circumstances necessitating the layoff were reasonably unforeseeable to Fluor—not only on June 1, 2017, the date on which Plaintiffs contend notice should have been sent, but also in all likelihood up to the date of the shutdown. For one, it is undisputed that SCANA intentionally withheld its decision to close the Project from Fluor and

others until July 31, 2017, and Fluor did not and could not weigh in on SCANA's decision-making process. (ECF No. 193 at 23-28.)

Further, although Plaintiffs insistently allege Fluor should have otherwise known of the impending closure, the court finds SCANA left no such trail of breadcrumbs to make the shutdown *reasonably* foreseeable. Plaintiffs admit to the following facts that are relevant to this analysis: transition teams—which worked on implementing SCANA's direct-owner model—kept working until July 31, 2017, not knowing the Project was closing until that date (*id.* at 23, 26); SCANA shared little information from its own ETC with Fluor, and intentionally did not include Fluor in meetings with Santee Cooper to discuss Fluor's cost assessment (*id.* at 24-25); SCANA never informed Fluor that Santee Cooper planned to withdraw from the Project (*id.* at 25-27); SCANA never informed Fluor executives that the Project's closure was being seriously considered (*id.* at 26-27); and the abrupt closure of such a large scale job site was unprecedented in the construction industry, particularly regarding nuclear construction, without notice and a period of winding down (*id.* at 29).

Fluor likewise did not have the full picture of the financial health of the Project. As Plaintiffs state it, SCANA

> relied on WEC and Fluor's input—their data, their computer models, and their people—to build its ETC models, [but] the contractors were *forbidden* from seeing the full outputs of that process. Neither WEC nor Fluor were allowed in the critical series of ETC presentations to SCANA and Santee Cooper executives, during which the owners confronted the magnitude of the project's costs. Even SCANA's "ETC review meeting" with Fluor in late June consisted only of bits and pieces related to Fluor's scope of work, which Fluor was asked to review for SCANA's benefit, not its own. The ETC's critical conclusion—the total cost of the project— was not discussed. In the second such meeting on July 5, SCANA similarly offered Fluor only glimpses of "portions" of the ETC. WEC's Vice President never saw any of the ETCs or even had them described to him. *SCANA unabashedly sought to keep WEC and Fluor in the dark about the critical ETC findings because it did not want them to "make any assumptions" about the fate of the [P]roject.*

(ECF No. 193 at 37 (Plaintiffs' Motion for Summary Judgment) (emphasis added) (internal citations omitted).)

Additional evidence shows the Project's closure was reasonably unforeseeable. Many witnesses indicated the Project's abrupt shutdown was a surprise, and that among the paths available to the Project, they believed a closure was the least likely option. (ECF No. 189-51 at 3 ¶ 6); (ECF No. 190-5 at 193:10-12); (ECF No. 190-15 at 2-4 ¶¶ 7, 11-12); (ECF No. 190-17 at 4-7 ¶¶ 19, 21-22, 24, 26(a)); (ECF No. 190-18 at 52:2-17; 87:14-88:1); (ECF No. 190-20 at 4-5 ¶ 9); (ECF No. 190-27 at 94:13-14 (Fluor CEO David Seaton stating "[w]e never thought the site would be abandoned")); (ECF No. 190-38 at 89:1-19; 114:3-115:4); (ECF No. 190-39 at 2-3 ¶¶ 5-7); (ECF No. 190-40 at 18:4-10, 22:1-7); *see* (ECF No. 190-31 at 39:19-24 ("[Fluor] was always under the assumption we were going forward")). The Public Service Commission of South Carolina, which had been involved in the Project's oversight for nearly a decade, felt "blindsided" by the closure and described it as a "gut punch." (ECF No. 189-82 at 35:3-11, 86:13-87:5 (Aug. 1, 2017 Public Service Commission Hearing Tr.).) None of the "dozens of other subcontractors working on the Project" purportedly issued WARN notices on or before June 1, 2017. (ECF No. 190-17 at 4-5 ¶ 20). The day after the shutdown, SCANA noted that its contractors were surprised by the closure and that "[t]he maintenance of confidentiality during this evaluation process . . . [was] critical." (ECF No. 189-82 at 33:14-20, 35:12-23 (Aug. 1, 2017 Public Service Commission Hearing Transcript).)

Further discovery revealed that SCANA itself was not sure of the Project's closure until the withdrawal of Santee Cooper on July 7, 2017, which occurred well after June 1, 2017, the latest date on which Plaintiffs contend Fluor should have sent WARN notice. (ECF No. 193 at 25-27.)

From the record it appears this withdrawal was critical—and also a closely-held secret by SCANA. (*Id.*)

Moreover, WEC's bankruptcy did not make the Project's closure probable. Indeed, while Fluor knew the bankruptcy would likely relieve WEC of its fixed-price arrangement, at least some evidence suggests Fluor took this bankruptcy as good news, as it hoped to expand its workload at the Project. (ECF No. 190-17 at 2 ¶ 7); (ECF No. 190-26 at 13:13-24; 38:6-17); *see* (ECF No. 189-35 at 1-2); (ECF No. 190-18 at 35:15-21 (SCANA began directly paying Fluor after WEC's bankruptcy to keep work ongoing at the Project)). Fluor relatedly was not savvy to negotiations between SCANA and WEC's parent company regarding the bankruptcy, and saw the subsequent $2.1 billion settlement as positive for the Project. (ECF No. 189-81); (ECF No. 190-15 at 3 ¶ 10); (ECF No. 190-17 at 3, 4 ¶¶ 15, 18); (ECF No. 190-30 at 266:2-18). Fluor had no reason to believe the IAA would not be extended beyond June 26, 2017, just as it had been previously. (ECF No. 190-17 at 2 ¶ 10). And contract negotiations appear to have been ongoing between SCANA and Fluor at the time of the Project's closure. (ECF No. 190 at 11-13.) At least some evidence suggests Fluor was open to overcoming certain scheduling and contractual concerns, including a proposed seven-day rolling schedule. (*See* ECF No. 189-84 at 1 ("I believe some of our staff . . . are warming to the idea that [the proposed rolling seven day schedule] can work if SCANA is willing to pay the premium[.]").)

Additionally, some of the evidence Plaintiffs cite for support is better understood within the broader context of the whole record. For instance, the full message of a June 21, 2017 text between Fluor executives reads as follows: "Interesting discussion with Michael Crosby, Lonnie is trying to convince SCANA they need a partner, *Dominion and Duke showing interest*, or [to] shut it down." (ECF No. 207-38 at 2 (emphasis added).) Another of Plaintiffs' partially-excerpted

cites comes from a conversation wherein Flowers stated he thought "there [wa]s a good chance [SCANA] only go[es] with one [nuclear reactor] unit[,]" instead of the original plan to construct two reactors. (ECF No. 207-34 at 21.) Further, a handful of days before the closure, a SCANA executive represented that it appeared SCANA's CEO "ha[d] approval for one unit for sure and . . . [was] pushing for two." (ECF No. 207-41 at 9.) At best, and when viewed in the context of the entire record, such evidence as that listed above and elsewhere in the record shows the mere possibility, rather than a probability, of the Project's total shutdown.

Fluor exercised commercially reasonable judgment in the unique industry of nuclear power. Only two nuclear reactor construction projects have been started in the last thirty years. (ECF No. 41 at 6 ¶ 32 (*Pennington*).) Before its closure, the Project represented a nearly ten billion-dollar investment in a highly regulated industry involving considerable health and safety concerns. (*See id.* at 5 ¶ 26.) SCANA petitioned the South Carolina General Assembly in order to gain permission to proceed with the Project in 2007. (*Id.* at 5 ¶ 25.) The General Assembly relatedly passed legislation that "provided huge incentives to build large-scale power plants." (*Id.* ¶ 27.) The Project was widely seen as necessary due to rising usage in electricity in the state, and customers were purportedly already paying additional fees to fund the Project. (*Id.* at 6 ¶ 28-29.) The Project involved thousands of workers and continued for nearly a decade. Given these facts, it was reasonable to conclude the Project would continue. The Project's abrupt closure was "sudden, dramatic, and unexpected," even as problems continued to mount. *See, e.g., Roquet*, 398 F.3d at 590 ("Case law reveals that WARN Act defendants need not show that the circumstances which caused a plant closing or mass layoff arose from out of the blue to qualify for the exception."); *but see Smith v. ABC Training Ctr. of Md., Inc.*, C/A No. JFM-13-306, 2013 WL 3984630, at *6 (D. Md. Aug. 1, 2013) (explaining the Consolidated Appropriations Act's passage in 2011 essentially

ended the defendant vocational school's "business model" of enrolling students who were eligible for federal aid, and the defendant's subsequent steady financial deterioration and ultimate closure in 2013 could have thus been reasonably foreseeable, rather than the product of "sudden, dramatic, and unexpected" business circumstances).

It is true Fluor knew the Project suffered from troubling, ongoing, and growing issues. In fact, the Project's problems were not new, as Fluor was initially hired in 2016 to help remedy the Project's status as over budget and behind schedule. (ECF No. 190-1 at 121:4-15; 132:15-133:2 (Pennington stating "[w]e were told we were behind schedule by . . . a lot of people. I mean, from the day one [sic] I got out there, we were behind schedule")); (ECF No. 190-14 at 34:13-23); (ECF No. 190-15 at 1-2 ¶ 5); (ECF No. 190-17 at 4 ¶ 19 ("[T]he Project was way over budget and behind schedule from 'day one' when Fluor showed up in January 2016, and that fact had not changed by June 1, 2017.")). But Fluor had no means of knowing SCANA's tolerance for cost overruns and scheduling delays. (ECF No. 190-15 at 2-3 ¶¶7-8); (ECF No. 190-17 at 2-4, 6 ¶ 10, 16-17, 25); (ECF No. 190-27 at 63:15-64:10, 160:17-161:4 (Fluor CEO David Seaton)); (ECF No. 190-28 at 126:5-12); (ECF No. 190-30 at 213:17-215:23; 250:14-19). Indeed, the above facts, lack of other nuclear construction projects across the nation, intentional lack of communication from SCANA, and unique nature of the industry made it unreasonable for Fluor to foresee the Project's sudden closure. Would the Project close if it was $1 billion or $10 billion over budget? Would it close if it was one year or ten years behind schedule? Would it simply be scaled back to one reactor, as opposed to two? Such questions reveal that even if Fluor knew the scope and depth of *all* the Project's problems—which it did not—Fluor would not have necessarily known what such issues meant for the Project's future. In fact, as noted above, numerous witnesses indicate the Project's total closure was the least likely option going forward. *See In re Flexible Flyer Liquidating Tr.*,

511 F. App'x 369, 373 (5th Cir. 2013) (explaining the UBC exception was applicable because cancellation of the contract at issue was merely a possibility and not a probability).

Furthermore, job sites within the construction industry are normally wound down for a period of time before being closed. (*See* ECF No. 193 at 29.) Such a period could provide sufficient time in which to issue adequate WARN notice. But here, both the Project's closure itself and the manner in which SCANA closed it—without winding down the job site—was reasonably unforeseeable. Rather than demonstrating willful blindness, Fluor exercised commercially reasonable business judgment and, along with many other entities associated with the Project, believed it would continue to progress.

Plaintiffs' contention that Fluor should have performed some level of additional investigation and "pick[ed] up the phone" to ask SCANA about the Project's future falls flat. (Unofficial Tr. 117:17-118:9 (Dec. 2, 2020 motions hearing).) Plaintiffs have identified no cases involving UBC that required or otherwise assigned a duty to an independent contractor to conduct an ongoing investigation into the continuing health and status of a job site. Instead, the standard for applying UBC is whether the closure was reasonably unforeseeable. The court looks to the entire record to determine reasonableness and declines to impose specific requirements necessary to meet UBC, such as whether a contractor called the principal client or otherwise completed some threshold level of investigation at some unspecified point during the job at issue.[31] Accordingly, even in the light most favorable to Plaintiffs, the court finds the UBC exception applies to Fluor regarding SCANA's shutdown of the Project.

---

[31] Even if Fluor had further investigated the ongoing issues with the Project, such investigation was unlikely to bear fruit. Plaintiffs admit SCANA purposefully kept Fluor in the dark regarding the closure and very few individuals knew of the plans to shut down the Project. (*See* ECF No. 193 at 22-27.) It seems unlikely a phone call from Fluor would have shed any light into the Project's future.

*(3) WARN Notice "As Soon As Practicable"*

Lastly, the court finds Fluor provided WARN notice after the Project's closure as soon as practicable. *See* 29 U.S.C. § 2102(b)(3) (employer relying on UBC exception must nonetheless provide "as much notice as is practicable"); *see, e.g., Sides v. Macon Cty. Greyhound Park, Inc.*, 725 F.3d 1276, 1284 (11th Cir. 2013) ("[I]t is manifest that a WARN Act employer attempting to circumvent the 60–day notice requirement must still give some notice in accord with 29 U.S.C. § 2102(b)(3)."). It appears Fluor distributed a non-WARN notice FAQ document to all employees at the job site on the date of the Project's closure. (ECF No. 190 at 23-24.) Fluor then mailed its craft employees WARN notice on August 4, 2017, and sent updated information on August 16, 2017. (*Id.* at 24-25.) Fluor relatedly sent WARN notice to its salaried employees between August 9-10, 2017.[32] (*Id.* at 25.) (*See* ECF No. 207 at 35-37.) Such notice was reasonable given the magnitude of the Project, the presence of thousands of workers at the job site, and the abrupt nature of the shutdown. Further, all Plaintiffs likely became aware of the Project's closure on July 31, 2017, when they were ordered to stop working at the job site. Finally, although Fluor's notice contained an email address instead of a phone number, this form of notice did not invalidate compliance with the WARN Act.[33] *See* 20 C.F.R. § 639.7(a)(4) ("It is not the intent of the

---

[32] It appears Plaintiffs main contention regarding untimely notice is that Fluor should have provided WARN notice on or before June 1, 2017. (ECF No. 207 at 35-36.) But as discussed above, Fluor was not required to provide 60-days' notice due to the UBC exception. Likewise, the court does not reach whether Fluor's craft employees were entitled to additional WARN notice because this contention is premised on the assumption that Fluor should have provided 60 days' notice under the WARN Act to its employees.

[33] Even if Fluor violated the WARN Act in the process of distributing notice as soon as practicable after the Project's closure, such minor violations would fall squarely within the good faith exception of the WARN Act to avoid an award of damages, particularly given the unique and unprecedented challenges brought about by the shutdown. 29 U.S.C. § 2104(a)(4); *see United Auto. Aerospace & Agr. Implement Workers of Am., Local 1077 v. Shadyside Stamping Corp.*, 947 F.2d 946 (6th Cir. 1991) (explaining WARN notice violations were in good faith when such notice included "much [but not all] of the required information" and unexpected business circumstances

regulations, that . . . minor, inadvertent errors are to be the basis for finding a violation of WARN."); *see also Schmelzer v. Office of Compliance*, 155 F.3d 1364 (Fed. Cir. 1998) (lack of phone number and other defects on notice did not violate the WARN Act and, regardless, plaintiff suffered no prejudice from the defects). Fluor is therefore not liable under the WARN Act.

### C. **Request for Judicial Notice**

The court examines Plaintiffs' request that the court take judicial notice of certain documents related to the upcoming criminal guilty plea of SCANA's former CEO.[34] (ECF No. 219.) "Plaintiffs seek to supplement the record with evidence that was not available until after the close of briefing: the November 24, 2020 Information and Marsh's Plea Agreement." (ECF No. 219 at 8.) Plaintiffs stress the Information alleges that

> The defendant KEVIN MARSH along with others known and unknown to the United States Attorney, consisting of former SCANA Corporation . . . executives, employees, and the lawyers who advised them, led a failed effort to construct two nuclear power generators in Fairfield County, South Carolina. As construction problems mounted, costs rose, and schedules slipped, the defendant, KEVIN MARSH, and others, **hid the true state of the project**. Through intentional and material misrepresentations and omissions, the defendant, KEVIN MARSH, deceived regulators and customers in order to maintain financing for the [P]roject and to financially benefit SCANA. The members of the conspiracy's actions and the associated coverup resulted in billions of dollars of loss.
>
> . . .
>
> Also on or about December 27, 2016, the defendant, KEVIN MARSH, received a separate briefing from a senior Toshiba official indicating that Toshiba could not absorb **the financial hit suggested by new estimates from Westinghouse's subcontractor for the work remaining on the [P]roject**. These briefings led the defendant, KEVIN MARSH, to believe that there existed a heightened risk of further construction delays. When, on December 29, 2016, the ORS requested detailed information from SCANA regarding the

---

were "rapidly evolving"); *Gen. Dynamics Corp.*, 821 F. Supp. at 1313 (technical WARN Act violation was a good faith omission).

[34] Plaintiffs frame this supplement as a request to take judicial notice pursuant to Rule 56(e). Rule 56(e) states that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . [1] give [the party] an opportunity to properly support or address the fact" or "[2] issue any other appropriate order." Yet as discussed below, the court declines to take judicial notice of certain documents related to Marsh's criminal case.

construction schedule for both units, the defendant, KEVIN MARSH, along with his coconspirators, withheld the information provided by the officials from Westinghouse and Toshiba.

(ECF No. 219 at 5 (emphasis in original) (citing ECF No. 219 at 1,10 ¶¶ 1, 30).)

Plaintiffs believe "Marsh's fraud may be relevant to whether the parties were on an equal footing, and with no disparity between them . . . and whether the actions were truly at arm's length, with no evidence of fraud or undue influence . . . and more than the standard one between two commercial entities negotiating a contract at arm's length." (ECF No. 219 at 6-7 (citations and internal marks omitted).) Specifically, Plaintiffs contend these documents dispute SCANA's assurance that its dealings with Fluor were at arms-length because SCANA's Project closure was the act "of a single [WARN] employer . . . doing all it could to hide its intent . . . during the period when WARN notice was required." (*Id.* at 3.) Plaintiffs also insist the Information and Plea Agreement "added to the foreseeability of the [Project's] shutdown" to Fluor, apparently based upon the ETC Fluor provided to WEC. (*Id.* at 3,7.) Lastly, "Plaintiffs submit that the Information and Marsh's Plea Agreement would be helpful to the [c]ourt." (*Id.*)

The court is permitted to "take judicial notice on its own." FED. R. EVID. 201(c). Moreover, the court may take judicial notice of a fact "that is not subject to reasonable dispute" because it is either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(1)-(2). The court likewise "may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508-09 (4th Cir. 2015) (citations omitted). *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record." (citation

omitted)); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("We note that '[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.'" (citation omitted)).

Here, the court declines to take judicial notice of the Information and Plea Agreement. Marsh has not yet entered a guilty plea in open court and the parties remain unbound by the proposed Plea Agreement. *See United States v. Marsh*, No. 3:20-cr-00727-MGL-1, ECF No. 12. The Information's allegations and Plea Agreement's confessions remain subject to reasonable dispute until Marsh enters a guilty plea that is accepted and approved by the court. While the court could take judicial notice of the Information as a court record, such notice would amount to acknowledging an Information was filed alleging Marsh committed fraud. This notice would not transform the allegations therein into undisputed facts, as Plaintiffs seek.

Even if the proposed Plea Agreement had been accepted and approved by the court, it does not appear the criminal conduct outlined therein would alter the outcome of this Order. The Information and Plea Agreement allege Marsh hid the true extent of problems at the Project from regulators and customers. (ECF No. 219-1 at 1.) Nowhere do these documents suggest the business relationship among SCANA, WEC, and Fluor deviated outside of arms-length dealings, such as while negotiating the EPC Agreement or subsequently complying with contractual requirements and industry regulations. Further, the Information and Plea Agreement reveal little connection between Marsh's allegedly fraudulent deception directed at regulators and customers—including SCANA "doing all it could to hide its intent" to close the Project—and a theory of WARN liability that would make it more or less likely that SCANA and Fluor amounted to a single employer.[35]

---

[35] Plaintiffs have not previously argued or alleged in the Complaint that Marsh's purported fraud was relevant to whether SCANA and Fluor were a single WARN employer. Plaintiffs respond that, "[b]efore . . . Marsh's Plea Agreement, Plaintiffs [] refrained from arguments based on

(ECF No. 219 at 3.) In fact, as examined *supra*, it is undisputed SCANA intentionally withheld its decision to close the Project from Fluor. (ECF No. 205 at 35.) Marsh's subsequent criminal charges for deceiving regulators and shareholders, as outlined in the Information and Plea Agreement, do not appear to shed light on whether SCANA and Fluor were a single employer under the WARN Act.

Additionally, the Plea Agreement and Information would not change the outcome of Fluor's UBC defense. The information revealed in these documents does not increase the foreseeability of the Project's abrupt shutdown to Fluor. Indeed, it appears instead to bolster Fluor's claim that the Project's termination was unforeseeable, as Marsh's alleged deception regarding the true state of the Project rose to purportedly criminal behavior. (ECF No. 219-1 at 1.) Likewise, the Information and Plea Agreement do not name Fluor as a co-conspirator or otherwise suggest it was culpable in Marsh's alleged criminal activity. Accordingly, the court declines to take judicial notice of the Information and Plea Agreement. (ECF No. 219.)

**D. Policy Considerations**

"What kind of company would refuse to give their own workers 60 days' notice and a humane chance to rearrange their lives, to try to find a new job, to try to find and make arrangements to pay their mortgage or to pay their rent?" Pagnattaro, *The Perils of Control*, 41 AM. BUS. L.J. at 318 (citing 100 CONG. REC. H. 17853 (daily ed. July 13, 1988) (statement of Rep. Brennan)). This question continues to ring true over thirty years later. SCANA's manner of abruptly closing the Project was unprecedented. A multi-billion dollar construction project for

---

extremely serious charges leveled against SCANA's executives and the risk of sullying the reputation of potentially innocent persons. Marsh's guilty plea, however, establishes as fact that he, as SCANA's top executive, conspired to commit fraud by hiding the true state of the project." (ECF No. 219 at 6 (internal marks and citation omitted).)

nuclear reactors was abandoned after nearly a decade of work, and thousands of workers were laid off essentially overnight with no notice, despite the WARN Act's explicit intention to prevent unexpected layoffs.

But the plain language of the WARN Act simply does not protect against all plant closures or mass layoffs. As examined *supra*, numerous cases, albeit in somewhat different circumstances, have found that no entity was liable under the WARN Act after a closure or layoff, thus leaving workers and employees dismayed and without recourse under the WARN Act. In other words, courts have long grappled with policy concerns surrounding the WARN Act's worker protections that Plaintiffs trumpet throughout their briefs.

Yet this court would be creating entirely novel policy concerns if it accepted Plaintiffs' theory of single employer WARN liability. Plaintiffs' theory would appear to open a principal client to single employer liability under the WARN Act with an otherwise wholly independent contractor simply due to some combination of either a plant closure, particularly if the closure is abrupt; compliance with regulations in a highly regulated industry; and compliance with a contract that was negotiated at arms-length. In the court's view, such a ruling would contort single employer WARN liability well beyond any precedent or Congressional intent and could have far-reaching implications on various industries, including construction. Plaintiffs' square-pegged single employer theory just does not fit within the particular shape of the WARN Act in this case.

## V. CONCLUSION

Accordingly, the court **GRANTS** Fluor's Motion for Summary Judgment (ECF Nos. 189 (*Butler*); 233 (*Pennington*)), **GRANTS** SCANA's Motion for Summary Judgment (ECF Nos. 192 (*Butler*); 236 (*Pennington*)), **DENIES** Plaintiffs' Motion for Summary Judgment. (ECF Nos. 191

(*Butler*); 235 (*Pennington*)), **DENIES** Plaintiffs' Request to Supplement (ECF Nos. 219 (*Butler*);

263 (*Pennington*)), and **DISMISSES** the case with prejudice.

       **IT IS SO ORDERED.**

                                  United States District Judge

January 6, 2021
Columbia, South Carolina